The CITY OF EDMOND, Oklahoma, Appellant,

v.

CORPORATION COMMISSION OF OKLAHOMA and Harper Oil Company, Appellees.

No. 44327.

Supreme Court of Oklahoma.

Sept. 12, 1972.

Robert T. Rice, City Atty., City of Edmond, and Max H. Lawrence, Oklahoma City, for appellant.

Harvey Cody, Conservation Atty., Nell Rhodes Fisher, Asst. Conservation Atty., Oklahoma City, for appellee Corp. Comm. of Okl.

T. Murray Robinson, Coleman Hayes and David G. Probst, Oklahoma City, for appellee Harper Oil Co.

BARNES, Justice:

This appeal involves proceedings the appellee, Harper Oil Company, hereinafter referred to as "applicant", instituted in this State's Corporation Commission, hereinafter referred to as "Commission", for permission to inject salt water into three oil well bores or holes on adjoining oil and gas leases it operates in what is known as the "East Edmond Field".

The composite leasehold under the oil and gas leases is known as the "South Bartlesville Sand Unit" and covers some 1,720 acres in Sections 19 to 33, both inclusive, in Township 14 North, Range 2 West, in Oklahoma County. The South Bartlesville Sand Unit will hereinafter be referred to merely as the "Unit"; and, in referring to these three holes, we will call them the "Clegern", the "Reynolds", and the "Van Mall". All three of these wells penetrated the Bartlesville (oil) Sand at varying depths of from 5,983 to 6,014 feet below the surface.

The proposed salt water injection is part of a water flooding project by which applicant contemplates that the salt water injected into the Bartlesville Sand through the three above named wells will enable it to produce oil through other wells on the Unit penetrating that sand.

The appellant, City of Edmond, along with Midwest City and Dell City, derive their municipal water supply from an extensive formation underlying much of central Oklahoma known as the "Garber Sandstone". In the Edmond area, it is found at a shallower depth than the Bartlesville Sand. One of the wells supplying Edmond with fresh water from that sand is situated within the same surface area included in applicant's above described Unit.

Fearing that applicant's proposed water flooding project would result in salt water pollution of its municipal fresh water supply, appellant filed a protest to applicant's three applications.

After a hearing at which all three applications were considered as consolidated, and both the applicant and protestant introduced evidence, the Commission entered its

Order No. 79,940 granting the applications. It found that the three subject wells were completed during the years 1949 and 1952 at varying depths ranging from 5,969 to 6,049 feet; that the 10¾ inch surface casing in the wells extends to depths between 205 and 226 feet below the surface; that said wells' (inner) casing, with a diameter of 5½ inches in the Clegern well and 7 inches in the Reynolds and Van Mall wells, extends to certain depths ranging from 5,969 to 6,049 feet below the surface; that, according to its evidence, protestant's water supply in the Garber Sandstone is derived from a depth of from 300 to 750 feet and seven of its wells produce from the latter depth, but only one is located on the Unit; and:

"9. That the proposed injection of salt water into (the Unit's above mentioned) wells as equipped, will adequately protect existing rights, surface and subsurface fresh waters and the migration of the salt water and allow its injection into the Bartlesville Sand without danger to the fresh water sources. * * *"

In its present appeal from said Order, protestant argues that the quoted finding is "in disregard of the evidence and facts."

At the trial, it was shown that, in years past beginning in 1942, applicant has drilled some 25 wells in the Unit area and that ten of these have been abandoned; that the permanently abandoned wells have been filled with mud and capped with cement, while the temporarily abandoned ones have been filled with mud only; and that a few of the abandoned wells have a cement plug at their bottoms, but others have only mud there.

It was shown that the salt water applicant proposes to put into the Bartlesville Sand through the three injection wells, will come from the Layton Sand at a depth of approximately 4,000 feet and be brought to the surface through 4-inch pipe in a well we will refer to as the "Johnson" (which is located in the SW NW of Section 29), and be carried to the three injection wells from a mile or more away, through 2-inch lateral pipes buried underground and connected with the injection wells' 2-inch tubing (inside their inner casing); that this casing will be cemented from the bottoms of these wells upward to a distance of 4,000 feet below the surface, and, at the bottom of the annulus, between the tubing and the casing, a packer would be set, and the rest of the annulus, upward to the surface, will be filled with fresh water.

According to the testimony introduced by applicant, any escape of salt water from the tubing into the fresh-water-filled annulus can be "monitored" on the basis of the pressure, and salt water content, of this annulus fluid.

The opinion of Mr. H, a consulting petroleum engineer, who testified as protestant's principal witness, differed from that of Mr. E and Mr. L, applicant's principal witnesses, as to the protection applicant's proposed plan would give the fresh water in the Garber Sandstone. Mr. E testified that if the salt water (in some way) escaped from the Bartlesville Sand, it would rise in a well hole no higher than 2,700 feet below the surface, and he testified further that it would be physically impossible to run an intermediate string of pipe, or a liner, between the tubing and the casing, or to cement between the latter and the surface casing to a point 750 to 1,000 feet below the Garber Sandstone. Mr. H's testimony tended to contradict Mr. E on both subjects. Mr. L, shown to be a petroleum engineer of considerable experience in dealing with Garber Sandstone water, gave testimony generally in accord with that of Mr. E. Among other things, Mr. L stated he was certain that the applicant's proposed plan would protect any such fresh water supply in the area and that it was one of the best plans he had ever known.

It would unnecessarily lengthen this opinion to describe all the evidence in detail. We have thoroughly reviewed the record, plus exhibits presented to the Commission, which have been separately made available to this Court, and have determined that, under our constitutional authority, the evi-

dence is such that the order appealed from cannot be disturbed as to the factual issues involved herein. Under Art. IX, § 20, of the Oklahoma Constitution, this Court's review shall not extend further than to determine whether the Commission's "findings and conclusions . . . are sustained by . . . substantial evidence." In Cameron v. Corporation Commission, Okl., 414 P.2d 266, we held:

"2. The Corporation Commission has a wide discretion in the performance of its statutory duties and this court may not substitute its judgment on disputed questions of fact for that of the Commission, unless the findings of the Commission are not supported by the law and substantial evidence.

"3. The determination whether there is 'substantial evidence' to support an order made by Corporation Commission does not require that the evidence be weighed, but only that the evidence tending to support the order be considered to determine whether it implies a quality of proof which induces the conviction that the order was proper or furnishes a substantial basis of facts from which the issue tendered could be reasonably resolved."

■ In accord with the foregoing, we have determined that there is substantial evidence tending to support Order No. 79,-940, supra, and its questioned findings of fact.

■ Under its second proposition, protestant argues that said order is contrary to the Commission's Rule 206(c) and (d), and deprives it of the equal and uniform interpretation of this Rule, to which it says it is entitled.

The cited Rule, which was combined with its Rule 207 by Commission Order No. 63,-817 promulgated in 1966, sets forth certain requirements for the drilling and casing of oil and gas wells. Paragraph (c) of said Rule reads:

"Suitable and sufficient surface casing shall be run and cemented to a depth not less than fifty (50) feet below all fresh water strata encountered in the well and in a manner that will protect such fresh water strata from contamination resulting from the drilling or operation of the well. Sufficient cement shall be used to fill the annular space behind the surface casing from the base thereof to the surface of the ground. * * *"

Subparagraph (d) of said Rule provides:

"Notwithstanding a compliance or attempted compliance with the foregoing requirements of this rule, if it is later determined that a fresh water strata exists in the well which has not been properly cased and cemented to the extent and in the manner necessary to protect such fresh water strata from contamination, the persons responsible for the drilling or operation of the well, under the direction of the conservation officer, or as ordered by the Commission, shall take such measures as may be necessary to so protect said fresh water strata."

Applicant points out that all of the wells in the Unit were drilled before the Commission promulgated the above quoted rule, and represents that when those wells were drilled they complied with the Commission's then existing rules. Protestant does not deny this, but complains of "unequal protection" on the basis of its representation that in a similar proceeding the Commission, by an order it entered therein during December, 1969, required an oil operator, as a condition of granting its application for permission to use a previously drilled well as a salt water injection well, to place cement in the annulus between its production casing and well bore from a point at least 50 feet below "the well bore of the fresh water formation and extending upward to the surface as provided in Rule 206(d) * * *." Each case must rest on its own facts and we will not attempt to determine in this case whether or not there was substantial evidence to sustain the order of the Commission in another case.

As previously stated, we find that there is substantial evidence to sustain the order

of the Commission in this case, and protestant has shown no cause for reversing the order appealed from herein.

Said order is therefore affirmed.

BERRY, C. J., DAVISON, V. C. J., and WILLIAMS, JACKSON, IRWIN, HODGES and LAVENDER, JJ., concur.